HELEN BULLOCK CHAPPELLET, Appellant, *v.*
F. V. BIRBECK, and FRANK M. BIRBECK,
Doing Business Under the Copartnership Name,
F. V. BIRBECK CO., Respondents.

F. V. BIRBECK and FRANK M. BIRBECK, Doing
Business Under the Copartnership Name, F. V.
BIRBECK CO., Appellants, *v.* HELEN BULLOCK
CHAPPELLET, Respondent.

Nos. 3873 and 3874

May 3, 1956.                                      296 P.2d 946.

(Petition for rehearing denied July 11, 1956.)

*Sinai & Sinai,* of Reno, for Chappellet.

*Springmeyer & Thompson,* of Reno, for Birbeck.

## OPINION

By the Court, BADT, J.:

On this appeal and cross appeal, revolving about an agricultural lease and the acts of the parties thereunder, the main points presented for our consideration are (1) the sufficiency of the evidence to support the court's finding of an insufficiency of water to irrigate the specified acreage, (2) the propriety of the court's conclusion,

based thereon, that under the terms of the lease the lessee thereupon rightfully canceled the same, and (3) the lessee having admitted that she had not installed the irrigation works required under the provisions of the lease, the propriety of the court's conclusion that by reason of the terms of the instrument she was liable in damages for such failure despite the finding and conclusion above recited.

We have concluded (1) that the finding of insufficiency of water is amply supported by the evidence and (2) that under the terms of the lease this finding justified the conclusion that the lessee was entitled to cancel the same; but (3) that the finding of insufficient irrigation water, and the consequent conclusion that the lessee was therefore entitled to cancel, compelled the further conclusion, under the terms and conditions of the instrument, that the lessee was not liable in damages to the lessors by reason of the lessee's failure to install the irrigation works.

The lessors were the plaintiffs below and the lessee the defendant. Involved here are an appeal by the defendant lessee and a cross appeal by the plaintiff lessors. The parties had entered into an agricultural lease for a term of five years, commencing July 1, 1952, at a rental of $5000 per year. Initial rental payment of $7500 was paid, together with a $2500 payment January 1, 1953, and a like payment July 1, 1953. On July 27, 1953 the lessee notified the lessors of her election to terminate the lease, relying upon a provision thereof hereinafter discussed at some length, vacated the premises and surrendered the same to the lessors. On September 28, 1953 plaintiffs brought their action for damages predicated upon a breach of the lease by the lessee, seeking judgment not only for the stipulated rental (less the fair rental value for the balance of the term) but also for damages by reason of the lessee's breach of her covenant to install certain specified irrigation works. Defendant in her answer admitted vacating the leased premises and alleged an insufficiency of water supply for irrigation

and her consequent right to cancel under the terms of the lease, together with justification, by reason of the insufficiency of the water, of her failure to install the contemplated irrigation system. After a pretrial conference the court at the commencement of the trial stated: "The principal issue in this case is whether or not there was sufficient water to cultivate all of the arable land which was leased by the plaintiffs to the defendant. Now, it has various ramifications but I understand that to be the principal issue." It becomes important for us to consider the provisions of the lease that bear upon a determination of the controversy in the trial court and the issues raised on this appeal.

Paragraph 3 requires the lessee to use the premises solely for agricultural and livestock purposes and for purposes incidental thereto and to farm, cultivate, irrigate and plant the arable portions of the property if there is sufficient water so to do. Paragraph 8 contained, among other things, the following clause: "Within a reasonable time, except beyond the control of the Lessee, after Lessee takes possession of the leased property, Lessee, at her sole cost and expense, will install and place in operation an electric power line to convey public utility electric power to the pumps on said leased real property and a twelve (12), or larger, inch irrigation pipeline from the point of intake to the upper ditch on said leased real property." Paragraph 14 provided that in the event of litigation a reasonable attorney fee should be fixed by the court in favor of the prevailing party. Section 15 included an option to the lessee to purchase the property for $150,000.

Paragraph 17 is as follows: "It is understood and agreed between Lessors and Lessee that this lease is predicated upon a sufficient supply of water available on or from the leased lands of Lessors for the irrigation and growing during the full growing season of crops consisting in whole or in part of alfalfa hay on at least 450 acres of the arable lands of said leased premises. In the event that there is an insufficient supply of water

from or on the leased lands of Lessors available to properly irrigate and grow the aforesaid crops for the complete growing season in any one year on said 450 acres of arable land as aforesaid, then Lessee shall have the right, at her election, to cancel this lease upon written notice to Lessors, and, in this event, Lessee shall not be obligated or liable in any respect to Lessors by reason thereof; and all advance rentals shall be pro-rated forthwith as of the date of said written notice."

Paragraph 18 reads, in part, as follows: "Water: In addition to the rights granted to Lessee as hereinabove set forth, if at any time during the term of this lease the water grants or water permits issued by the State of Nevada in respect to the leased real property or waters, water rights, ditches, ditch rights, appurtenant to the land, are unreasonably decreased for any reason except: (a) the failure of Lessee to beneficially use all of such water; or (b) any other act or omission of the Lessee, Lessee, upon written notice to Lessors, may terminate this lease forthwith, provided, however, that Lessee shall give such written notice of termination to Lessors of the happening of any of the events hereinabove set forth. Upon any such termination the rents hereunder shall be pro-rated on the basis that the semi-annual rent reserved hereunder is $2500, payable in advance, except as hereinabove provided. Lessors shall be entitled to the rentals on said basis for the full unexpired portion of the term to the date of termination; if Lessors have received rents in advance, in respect to an unexpired portion of the term, they shall pay Lessee the pro-rated portion of any rents paid in advance attributable to the unexpired portions of the term."

Paragraph 23 reads as follows: "Lessors agree to take whatever steps are necessary and proper to perfect their rights to all the waters to which they are entitled, either under the pending applications filed in the Office of the State Engineer of the State of Nevada, or otherwise."

Pursuant to the finding of insufficient water the court made the following conclusion: "On July 27, 1953

defendant was entitled to cancel said lease, that defendant, on said date, did cancel said lease and therefore was entitled to vacate said premises and to be exonerated and discharged from all future performance of any obligation imposed by said lease." The court made the further finding: "On July 27, 1953 defendant rightfully canceled said lease in accordance with the terms of said lease."

Plaintiffs (lessors) possessed three established water rights appurtenant to the lands involved. Of these we need consider but one. Without it there was a clear insufficiency. This was a right to "divert" and use five cubic feet per second (5 c.f.s.) or 1,787.82 acre-feet of *underground water* with a priority of 1947 granted by certificate of the state engineer. The source of this underground water was a drain ditch varying from four to six feet in depth which served to drain an airfield near the lessors' lands and which emptied into Steamboat Creek, a tributary of the Truckee River. Lessors were given a right to pump their underground water from a point (referred to as a "rediversion") in Steamboat Creek, but the point of diversion specified in their certificate was located in the drain ditch.

Defendant's case was based upon testimony of qualified experts to the effect that there was not sufficient *underground* water in the drain ditch to provide more than .085 c.f.s. under lessors' water right. This testimony was based upon measurements made at or near the specified point of diversion. In no respect was it rebutted. Unless it was rejected by the trial court, no other finding could have been made than that the underground water available was insufficient.

Lessors first contend, as a matter of law, that the appropriate question of fact was not whether there was sufficient underground water in the drain ditch to meet their water right, but whether there was sufficient water in Steamboat Creek at the pumping point. They contend that their water right gave them the right to pump that

amount of water at that point. They contend that, for a court to entertain evidence such as was received below, is to permit an improper attack upon their water right and upon the determinations of the state engineer upon which it was based.

We must reject these contentions. The state engineer's original preliminary approval of lessors' application provided: "This permit is issued subject to all existing rights on the source and with the understanding that the permit will be limited to the *water available at the point of diversion* * * *. (Emphasis supplied.) This language was reiterated by the state engineer in his final ruling on a protest of the application by one Lester C. Jones and others.

Defendant's evidence was no attack upon lessors' *water right*. The evidence served simply to establish factually the extent of the limitations which the certificate recognized to exist.

Lessors attack the testimony of defendant's witnesses upon another ground. Those witnesses testified that water in the drain ditch did not all come from an underground source; that the greater portion of the water in that ditch (all but .085 c.f.s.) came from surface drainage. This surface drainage forms a part of the waters of the Truckee River and its tributaries, all of which were subject to prior appropriations as adjudicated by what is known as the Truckee River Decree, administered through a watermaster. Lessors contend that this constituted an attack upon their water right in that the testimony in this regard was not factual but was based upon the witnesses' conclusions, contrary to those of the state engineer, that the drain ditch was not a proper source of underground water nor a proper method of tapping an underground water source. From a study of the record we would not so view the testimony. The nature of the measurements made by the witnesses, as

we understand their testimony, was to check the sources of surface flow into the ditch, measure that flow, and deduct it from the total flow. If there be any dispute as to the propriety of the drain ditch as a source or means for the tapping of underground water, we do not reach that question in this matter.

We conclude that it was proper for the court below to receive evidence as to the extent of underground water applicable to lessors' water right at the point of diversion; that such evidence clearly supported the court's finding that there was an insufficiency of water; and that the court's conclusion as to the lessee's right to cancel naturally and properly followed.

We are therefore next confronted with the question as to whether, in view of the findings and conclusions just discussed, the court's finding that defendant wrongfully failed to install or place in operation the electric power line or the irrigation pipeline from the point of intake of the pumps to the upper ditch, or the finding of the reasonable cost thereof in the sum of $34,828.22, or the conclusion that plaintiffs were entitled to judgment for damages in such sum (subject to a refund to defendant of $7133 advance rentals) may be supported.

In the first place, the insufficiency of available water being found as a fact, and the defendant's right to cancel the lease having been properly concluded by the court as a result of such finding, under the terms of the lease itself it would further logically appear that the clause relieving the defendant of liability *in any respect,* in such event, would seem to preclude a recovery by the plaintiffs of damages resulting either from defendant's failure to pay further rentals during the term of the lease or from her failure to install and place in operation the contemplated irrigation works. Defendant pointed out in her opening brief on appeal that the only possible

basis of awarding of damages for failure to install the irrigation works (in view of the prior finding of insufficient water and the conclusion justifying cancellation) would be in the conclusion that the covenant to install the irrigation works was an independent covenant. Plaintiffs' only response to this contention was that they were entitled to be placed in as good a position as they would have been in had the defendant complied with the requirements of this covenant; in other words, that they would have had their 450 cultivable and irrigable acres with pumps, power line and pipeline installed ready for the irrigation thereof, and that such was their right under the terms of the lease. Without water available for use in such proposed irrigation system, upon which availability the lease was predicated, such conclusion is neither logical nor realistic. It is significant that the lessee's covenant under section 8 of the lease was not only to install the power line and pipeline but also *to place it in operation*. It is neither logical nor realistic to conclude that the failure to install and operate the contemplated irrigation system was such an independent covenant of the lease as to entitle lessors to damages for the failure of construction when it is found in the same breath that the water was not there to be pumped, with power that could not be used, through a pipeline that would remain dry, into a ditch that would carry no water.

The judgment in favor of the lessors, plaintiffs below and cross appellants herein, for damages for failure to install the irrigation works and for damages for future rentals during the term of the lease must therefore be reversed. This being so, the assignment made in the cross appeal of the lessors that it was error for the court to credit the advance rentals against the judgment for damages becomes moot and need not be considered.

The lease, as noted, provided for the allowance of an attorney fee to the prevailing party in the event of litigation over the lease. The plaintiffs alleged in their

complaint that $5000 was a reasonable attorney fee and they sought, among other things, a judgment for this sum. At pretrial conference it was agreed that a reasonable attorney fee to be assessed in favor of the prevailing party was $2500 and the court awarded the plaintiffs judgment in this sum on this item, in addition to the plaintiffs' costs. This likewise must be reversed.

It is therefore ordered: (1) that the judgment that defendant was entitled to cancel the lease by reason of insufficiency of water to irrigate 450 acres is affirmed; (2) that the judgment awarding damages to the plaintiff lessors is reversed; (3) that the judgment awarding $2500 attorney fees and costs to the plaintiffs, cross appellants herein, is reversed; (4) that the cause is hereby remanded to the district court with directions to enter judgment in favor of defendant, together with her costs and $2500 attorney fee; (5) that appellant, defendant below, recover her costs in this court.

MERRILL, C. J., and EATHER, J., concur.